Filed 5/31/22  P. v. Pimentel CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071786 |
| v. | (Super.Ct.No. FSB1103091) |
| EMMANUEL PIMENTEL et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Smith, Judge.  (Retired judge of the San Bernardino County Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part, reversed in part, remanded with directions.

Randi D. Covin, under appointment by the Court of Appeal, for Defendant and Appellant, Emmanuel Pimentel.

Raymond Mark DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant, Jesus Urzua.

1

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Emmanuel Pimentel and Jesus Urzua appeal their three murder convictions, for which the jury found true special circumstances and returned verdicts of life without the possibility of parole. Pimentel and Urzua raise several arguments about alleged errors in the proceedings below, some jointly and some individually. We affirm the convictions, except, based on recent changes to the law, we must vacate the jury's true findings on gang-related special circumstances, gang enhancement allegations, and certain personal firearm use enhancements and remand for further proceedings.[1]

## I. BACKGROUND

On July 11, 2011, at about 6:00 p.m., a woman was outside her San Bernardino mobile home when she saw two men walk by. She recognized Urzua; her grandson would sometimes play video games with him. Urzua carried a shotgun pressed against his leg.

Pimentel and Urzua went to space 52, a trailer where Jesus Tiburcio lived. Tiburcio's brother, Ruben Sanchez, lived in a nearby trailer. Their cousin, Evaristo

---

[1] Undesignated statutory references are to the Penal Code.

Contreras, had stopped by to visit their sister Brenda Tiburcio, who also lived nearby and had just given birth.[2]

A second woman was outside another trailer helping her father wash his car. She heard a loud bang, which she initially thought was fireworks. She saw five individuals, including Sanchez, who was on the stairs of a trailer, and Tiburcio, who was on the ground. She saw a man with a shotgun reach for shotgun shells from the man next to him. The man with the shotgun then fired it at one of the other men, who then yelled "Brenda" and "help me."

Brenda looked out her window and saw Urzua, whom she knew. She also saw Sanchez, whose face was "full of blood." Urzua was laughing. She saw Urzua and "the other person" run away. She ran outside and saw Contreras, who took a couple of steps and fell. He said, "Brenda, I'm going to die." Brenda asked who was responsible, and Contreras replied "Jesus and his brother." Brenda saw Tiburcio, who "had a hole in his head" with blood "coming out like a water hose." Later, in the ambulance, when a police officer asked who shot him, Contreras replied "Jesus."

Officers were dispatched around 7:08 to 7:14 p.m. and were notified that the suspects were two Hispanic males running from the mobile home park. The officers saw Pimentel and Urzua at 7:23 p.m.

---

[2] For clarity, we refer to Jesus Tiburcio (a victim) as "Tiburcio" and Brenda Tiburcio (a witness) as "Brenda." We mean no disrespect.

3

As the officers approached Pimentel and Urzua, Urzua (as well as a third individual who was with defendants when the officers approached them) complied with the officers' demands. Pimentel ran. Pimentel threw away a silver handgun. A pursuing officer eventually caught up to Pimentel, tackled him, and took him into custody.

Tiburcio, Sanchez, and Contreras all died from their wounds. Tiburcio and Sanchez each died from a single handgun shot wound to the head, while Contreras died from a single shotgun wound to the abdomen.

Pimentel and Urzua were each charged with three counts of first degree murder. At a joint trial, the People contended that Pimentel shot Tiburcio and Sanchez while Urzua shot Contreras; both, however, were alleged to have been aiders and abettors for the murders of the victims they did not directly kill.

The People's theory of the case was fourfold: (1) Pimentel and Urzua were members of the Onterio Varrio Sur (OVS) criminal street gang; (2) Urzua was a suspect in an earlier robbery; (3) Sanchez had given investigators information about Urzua as part of an investigation into that robbery; and (4) the killings were meant to show the neighborhood that OVS would retaliate against police informants.

An expert witness on criminal street gangs opined that Pimentel and Urzua were active OVS gang members. This was based in part on their tattoos. Pimentel, for instance, had "Onterio" tattooed on his stomach, and the expert stated that OVS spelled Ontario with an "e." Pimentel also had a "W" tattooed on his right leg and "E" on his left leg, referencing "West End . . . Ontario being on the west side of . . . San Bernardino

4

county." Pimentel also had the letters "OVS" tattooed in block letters on his head. Urzua had "West End" tattooed on his wrist as well as an "I" on his right shoulder and an "E" on his left, "Inland Empire" being another symbol of the OVS gang. Additionally, in 2004 and in 2007, Pimentel admitted that he was an OVS gang member, and Urzua told police in 2009 and 2010 that he was an OVS gang member. Cynthia Urzua—Urzua's sister as well as the mother of Pimentel's children—also testified that Pimentel was an OVS member.

About a month before the homicides, police had investigated an attempted robbery at Amigo's Market in San Bernardino. An investigator learned that Sanchez might know one of the two suspects. The investigator went to Sanchez's trailer and spoke with him briefly. Upon being asked whether an individual in a photo was "Jesus," Sanchez stated that it was. Sanchez then refused to answer whether he knew where Urzua lived and shut the door. Although the conversation took no more than two minutes, the uniformed officer and his partner were at the trailer park for about 10 minutes, and several other people were standing outside of their mobile homes at the time.[3]

The prosecution's criminal street gang expert testified that "cooperating with law enforcement, it's almost the biggest thing that you can commit with gang culture. You don't talk to police. You don't cooperate in any shape or form with law enforcement,

---

[3] The parties stipulated at trial that the second suspect from the Amigo's Market incident was not Pimentel.

that's just Rule Number 1 within the gang. They like to keep everything secret. There's repercussions if you do cooperate with police."

Pimentel and Urzua pursued different defenses.

Pimentel's defense was that he shot all three victims in self-defense after the three began attacking him and Urzua. Pimentel testified that about a month before the shootings, a group of masked assailants kidnapped him as he walked to the Ontario parole office to turn himself in for a violation. At one point the kidnappers pointed a gun at him and demanded to know where Pimentel's brother was, telling Pimentel that his brother had "fucked up." Pimentel eventually escaped, discovered that he had been taken to Fresno, and returned home. A police investigation into the kidnapping revealed that Pimentel's brother had been involved in a failed drug deal.

A month later, on the day of the shootings, Pimentel decided that he would turn himself in again and sought drugs to smuggle into prison. Urzua made a call to arrange a purchase and handed the phone to Pimentel. Someone on the other end of the line recognized Pimentel's voice and began threatening him, saying "[w]e need to talk" and that "[i]f you don't show up, we know where your kids go to school, where your babies' mother works, where your people stay at, and where your brother stays at." Pimentel and Urzua then went to Tiburcio's trailer, where they were offered glasses of water before the three men suddenly started attacking them. Pimentel and Urzua had only a handgun between them. Pimentel fired at two of the men, then grabbed a shotgun from Urzua (who had wrestled it from the third victim) and fired it. He then placed the empty casings

6

in his pocket and fled the scene with Urzua.  When asked why he went to the trailer park, Pimentel stated that "[m]y intent was to meet them halfway, since they asked me to go over there and talk about whatever the issue was in regards to my brother, to basically squash it.  I don't know if you guys know what that word means.  Squash it, you know, hope we can leave it at that and I can go turn myself in.  And I worried about my family."

During Pimentel's cross-examination, the People read into the record two handwritten messages ("kites") Pimentel had written to Urzua while in jail pending trial.  The kites were found tightly bundled in Urzua's socks.

The first kite described events leading up to the shooting that closely matched Pimentel's trial testimony.  After describing Urzua's phone call for drugs, the kite says: "Once you heard this, you were surprised and couldn't believe what you heard."  The kite described the events as "what I'm putting on their heads," that "the reason why I'm not wanting to say that I didn't shoot anyone of them in self-defense is cuss [*sic*] that will look bad against me and you," that "they already know . . . that their DNA was all over me," and that "[y]ou just have to back up my story to the very point where you pulled back with the escopeta[**4**] and went into shock."

In the second kite, Pimentel again described the events and stated that "when it comes to our defence [*sic*], I need you to know and understand that it's a pretension!!!"  Pimentel also stated that "no, my lawyer don't know you had the escopeta on you or in

----

**4**  "Escopeta" is a Spanish word meaning "shotgun."  (Collins Dictionary, <https://www.collinsdictionary.com/dictionary/spanish-english/escopeta>.)

7

the pad. He asked me and I told him no, I never seen you with the escopeta, that the escopeta came from the blue car."

When questioned about the kites, Pimentel testified that he was simply reiterating to Urzua what had actually happened and what he told his investigator.

Urzua, who did not testify, also contended that Pimentel shot all three men. Urzua's defense, however, was that Pimentel killed them in a jealous rage over Tiburcio's attempt to pursue Cynthia Urzua (Urzua's sister and the mother of Pimentel's children) romantically.[5]

Cynthia testified that she has two children with Pimentel but was no longer in a relationship with him. She stated that Pimentel became jealous and acted violently toward her on multiple occasions, such as dragging her by the hair. Cynthia had once obtained a restraining order against Pimentel.

Cynthia and Tiburcio were "friends" on Facebook. About a month and a half before the shootings, in response to a post Cynthia made, Tiburcio replied: "Damn, you still looked good back then, jaja." Cynthia also described two brief, private message exchanges with Tiburcio. She read those aloud on the stand: "Go to sleep. Lol. Why should I? I don't know, cause is late and there's nothing to do. And then May 29th, 12:05, So what do [*sic*] doing, Cynthia?"

---

[5] We will hereinafter refer to Cynthia Urzua as "Cynthia" to distinguish her from the defendant. Again, we mean no disrespect.

Cynthia also described a phone call with Pimentel after he had been arrested. During the call, Pimentel twice told Cynthia that she should have "thought about things," which suggested that the shootings were connected to her in some way.[6]

The jury found Pimentel and Urzua guilty as charged, returning guilty verdicts on three counts of first degree murder (§ 187, subd. (a)), finding true the alleged sentence enhancements on all counts for firearm use (§ 12022.53, subds. (b)-(d), (e)(1)) and committing the crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)), finding true special circumstance allegations on all counts for carrying out the crimes in furtherance of a criminal street gang (§ 190.2, subd. (a)(22)), and finding true a special circumstance allegation of committing multiple murders (§ 190.2, subd. (a)(3)). Following the penalty phase of the trial, the jury returned verdicts of life without the possibility of parole.

The trial court sentenced both defendants to life without the possibility of parole, with each count running concurrently. For both defendants, the trial court also imposed a consecutive term of 25 years to life for the firearm use enhancement under section 12022.53, subdivision (d) (for counts 1 and 3 for Urzua, and counts 1 and 2 for Pimentel, but each term running concurrently) and stayed the other firearm use enhancements.[7]

---

[6] We include a portion of the transcript of the call and discuss the call further in section II. B. 1. , *infra*.

[7] The trial court did not formally stay the gang enhancements under section 186.22, subdivision (b) but instead noted during sentencing that the enhancement "does not carry any additional term of imprisonment" because it "set[s] a statutory minimum of parole eligibility of 15 years."

II.  DISCUSSION

A.  *Pretrial Issues*

   1.  *Motion to Sever (Pimentel and Urzua)*

As the case was preparing for trial, Urzua moved to separate his guilt and penalty phase trials from those of Pimentel.  Urzua contended that his and Pimentel's defenses were inconsistent and that the admission of the kites at trial against Pimentel would prejudice Urzua.  Pimentel joined the motion, and the trial court denied it.

On appeal, defendants claim that the denial of the severance motion was an abuse of discretion and that the joint trial was fundamentally unfair.  As we explain, we find no abuse of discretion.

"Section 1098 expresses a legislative preference for joint trials.  The statute provides in pertinent part:  'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.'  [Citation.]  Joint trials are favored because they 'promote [economy and] efficiency' and '"serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."'  [Citation.]  When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a '"classic case"' for a joint trial." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman and Marlow*).)

"[S]everance may be appropriate 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on

multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40.)  Additionally, "severance may be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" (*Ibid*.) "[L]ess drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice." (*Ibid.*)

"A court's denial of a motion for severance is reviewed for abuse of discretion, judged on the facts as they appeared at the time of the ruling.  [Citation.]  Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial." (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.) "Conversely, even if a trial court acted within its discretion in denying severance, '"the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law."'" (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079 (*Thompson*).)

We begin with Pimentel's contentions, then address Urzua's.

### a.      Irreconcilable Defenses

Pimentel contends that severance should have been granted because of irreconcilable conflicts between his defense and that of Urzua.  We disagree; the defenses differed on the issue of motive, but the conflicts were far from irreconcilable.

"'Although there was some evidence before the trial court that defendants would present different and possibly conflicting defenses, a joint trial under such conditions is not necessarily unfair.  [Citation.]  "Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis*."[8] [Citation.]  If the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case."'"  (*Thompson*, *supra*, 1 Cal.5th at p. 1081.)  "'Thus, "[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other."  [Citation.]  "Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty."'"  [Citation.]  When, however, there exists sufficient independent evidence against the moving

---

[8]  Pimentel contends that abuse of discretion was found in *People v. Wheeler* (1973) 32 Cal.App.3d 455, but he is incorrect; the court there made no such finding.  At best, the Court of Appeal there held that even if denial of the severance motion were an abuse of discretion, it would have been harmless, but this does not mean that the court found an abuse of discretion.  (*Id.* at p. 461.)

defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.)

Nothing about the conflict between Pimentel's argument that the shootings were made in self-defense and Urzua's argument that the shootings were caused by a jealous rage would itself tend to support an unjustifiable inference that both men were guilty. Moreover, there was no attempt to shift responsibility for the killings to each other, even though "[t]he mere fact that defendants '"may attempt to shift responsibility to each other does not compel severance of their trials."'" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 820 (*Daveggio and Michaud*).) Here, both Pimentel and Urzua contended that Pimentel shot all three men, and the only difference in their defenses was why. Under these circumstances, we find no abuse of discretion.[9]

### b. Fundamentally Fair Trial

Pimentel also contends that the joint trial was fundamentally unfair.

"Defendants bear the burden of establishing that the trial was grossly unfair and denied them due process of law, and 'a judgment will be reversed on this ground only if it is "reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt."'" (*Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 821.)

---

[9] We note that Pimentel has made no attempt to show a reasonable probability that he would have received a more favorable result in a separate trial. (See *Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.) Accordingly, even if we had found an abuse of discretion, he would have failed to show that reversal is warranted.

In contending that the joint trial was fundamentally unfair, Pimentel relies on *United States v. Tootick* (9th Cir. 1991) 952 F.2d 1078 (*Tootick*). *Tootick* does not convince us that reversal is required.

In reversing convictions based on a prejudicial failure to sever, the federal Ninth Circuit Court of Appeals in *Tootick* heavily relied on the lack of limiting instructions. For instance, it noted that during opening statements, one defendant's counsel referred to the other defendant "twenty-five times by name, and seventy-two times by the use of personal pronouns. After this highly inflammatory opening statement, the trial judge proceeded directly to call for the government to present its case. No admonitory comments were made to the jury. No additional instructions were provided. Not once in the entire course of the morning proceeding did the court reiterate the generic instruction that lawyer talk is not evidence." (*Tootick*, *supra*, 952 F.2d at p. 1084.) Although some limiting instructions were given, those instructions "consisted of brief statements to the effect that arguments were not evidence, given only at the traditional times, and a generic instruction pertaining to joint trials, given at the end of the trial." (*Id.* at p. 1085, fn. omitted.) As well, "[n]o cautioning instructions were given directly after the damaging opening arguments of the respective defendants." (*Ibid.*)

Here, during closing statements, Urzua's attorney repeatedly stated a personal belief that Pimentel shot all three men in a jealous rage, such as by arguing, "I told you from the beginning that I think the best theory is jealousy." However, after Pimentel's attorney objected, the trial court admonished the jury at length, noting that "during all of

14

the attorneys' closing statements, they are permitted to talk about the evidence, obviously, and what they believe the evidence either does or does not show or what are or are not reasonable inferences or conclusions from the evidence.  But the attorneys are not permitted, and it's improper for attorneys to give their own personal opinion or their own personal beliefs or vouch for or against a particular witness or testimony.  [¶]  So whenever it seems that an attorney is doing that, you should treat those statements as being their argument as what the evidence shows, not their own personal opinion or their own personal belief."

Accordingly, in stark contrast to *Tootick*, the trial court here admonished the jury soon after the arguably prejudicial attorney statements were made.  In any event, as our Supreme Court has noted, *Tootick* "predate[s] the United States Supreme Court's decision in *Zafiro v. United States* (1993) 506 U.S. 534[ . . .], where the high court explained that '[m]utually antagonistic defenses are not prejudicial *per se*."  (*Thompson*, *supra*, 1 Cal.5th at p. 1081; see also *Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 819 [noting that *Tootick* is "a Ninth Circuit case applying rule 14 of the Federal Rules of Criminal Procedure"].)  Accordingly, *Tootick* does not support a conclusion that the joint trial here was fundamentally unfair.

### c.      *Co-Admissibility of Kites*

Urzua also contends that severance should have been granted because his defense was mutually antagonistic with Pimentel's, he was prejudicially associated with Pimentel,

15

and the joint trial was fundamentally unfair. Urzua offers some different reasons than Pimentel as to why this might be so. Again, however, we are not persuaded.

Central to all of Urzua's contentions is the premise that because of the joint trial, Urzua was "tied to the hip" of Pimentel's self-defense theory. Urzua characterizes that theory as "'patently false'" in light of the two kites that Pimentel wrote, which appear to acknowledge that the self-defense theory is a fabrication. Urzua contends that the kites would not have been admissible against him in a separate trial, and that their admission in the joint trial tied him, in essence, to Pimentel's sinking ship. In our view, although the kites likely would not have been admissible in a separate trial against Urzua, their inclusion in the joint trial did not render the trial court's denial of severance an abuse of discretion.

At the same pretrial hearing where the court ruled on the severance motion, the court also held that the kites were cross-admissible against Urzua as coconspirator statements, which, though hearsay, are generally admissible. "'Hearsay evidence is of course generally inadmissible. (Evid. Code, § 1200.) Hearsay statements by coconspirators, however, may nevertheless be admitted against a party if, at the threshold, the offering party presents "independent evidence to establish prima facie the existence of . . . [a] conspiracy."' [Citation.] Pursuant to Evidence Code section 1223[, which sets for the coconspirator exception], '[o]nce independent proof of a conspiracy has been shown, three preliminary facts must be established: "(1) that the defendant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in

16

furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.”’” (*Thompson*, *supra*, 1 Cal.5th at p. 1108.)

The trial court determined that the kites were made as part of a conspiracy “to avoid prosecution and conviction” by having “a valid joint defense.” This rationale, however, would not justify admission of the kites against Urzua.

If, on the one hand, the conspiracy at issue was a conspiracy to commit murder, then the conspiracy ended when Tiburcio, Sanchez, and Contreras were killed, as “acts committed by conspirators subsequent to the completion of the crime which is the primary object of a conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy.” (*People v. Zamora* (1976) 18 Cal.3d 538, 560; see also *Krulewitch v. United States* (1949) 336 U.S. 440, 443 [rejecting the idea that “even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective”].)

If, on the other hand, and as the trial court’s ruling indicated, the conspiracy was a conspiracy to avoid prosecution and conviction by having a joint defense, then this is not a true conspiracy at all, as planning such a defense is not a crime or civil wrong. (See Evid. Code, § 1223, subd. (a) [coconspirator statement exception to hearsay rule applies only if statement was made “by the declarant while participating in a conspiracy to commit a crime or civil wrong”].)

17

Nevertheless, whether or not the kites would have been admissible against Urzua in a separate trial, there is no reason to believe that the kites—which characterized the self-defense theory as a "pretension" and something Pimentel was "putting on their heads"—inexorably chained Urzua to Pimentel's defense.

At trial, all parties clearly communicated to the jury that three distinct versions of events were at play, one advanced by the prosecution (a gang theory), one advanced by Pimentel (a self-defense theory), and one advanced by Urzua (a jealousy theory). The People, for instance, spent time in the rebuttal portion of its closing argument disputing Pimentel's theory ("The defense's whole position for Mr. Pimentel is this was self-defense. That just doesn't weigh when you look at the evidence in this case.") before addressing Urzua's theory ("you heard it was supposedly this one Facebook post that caused Defendant Pimentel to kill three people") and finally reasserting its gang theory ("It is first-degree murder. And when you do it and you're wearing gang clothing, when you're showing your gang tattoos, you're clearly wanting to benefit your gang.").

Pimentel also noted during his closing argument that he, Urzua, and the People each had different versions of what happened. His counsel stated: "There are three different versions of the facts in this case. All right? There is the prosecution's facts which is based on a robbery at the Amigo's Market. . . . Then there is [Urzua's] version of the facts which is Manny is the Facebook jealousy killer. [¶] Then there is our version of the facts which is based on Manny being kidnapped."

Significantly, Urzua's counsel did the same during Urzua's closing argument, advancing his jealousy theory as the most reasonable of the three. During Urzua's closing statement, counsel stated that "[t]he evidence shows that Pimentel killed all three of these people because of jealousy." Counsel continued: "One of the things I wanted to say earlier was that the case for jealousy is not as strong as it might be, but if you look at the evidence for the case for jealousy, you compare the case for the kidnapping or the case for the gang, it certainly is the strongest of the three. That's why it's the most reasonable of the three."

In this context, Urzua's contention that the jury would have been unable to separately evaluate the merits of Pimentel's self-defense theory against the merits of Urzua's jealousy theory is simply speculation. There is nothing in the record to suggest that the jury would have necessarily (or even likely) linked Urzua's guilt or innocence to Pimentel's self-defense theory. Accordingly, we reject the argument.

### d. Urzua's Remaining Arguments

To the extent they are distinct from Pimentel's arguments that we have addressed above, Urzua's remaining contentions regarding severance are also without merit.

Urzua first contends, in passing, that Urzua and Pimentel's relationship was "inherently prejudicial" simply because Pimentel was characterized as Urzua's "'mentor'" and "'gang homie.'" If severance were required in every case where defendants mentored one another or were in gangs together, then the statutory preference for joint trials would quickly become no preference at all. In any event, strong evidence

19

which also would have been admitted in a separate trial showed that Urzua was a member of the OVS gang.

Second, Urzua argues that severance was necessary because Pimentel at times acted as a second prosecutor. This argument is based on a single incident—an evidentiary ruling where Urzua says Pimentel acted "in tandem with the prosecutor"— that Urzua does not challenge on appeal. Since Urzua implicitly concedes the correctness of the ruling on appeal, it matters little whether Pimentel and the People similarly acted against Urzua's interests in obtaining the ruling.

In sum, we find no abuse of discretion in the denial of defendants' severance motions.

2. *Admission of Kites as Violation of Due Process (Urzua)*

Incorporating his arguments regarding the admissibility of the kites discussed above, Urzua separately contends that their admission violated his due process right to a fair trial. We find no such violation.

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair. [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439, italics omitted, citing *People v. Watson* (1956) 46 Cal.2d 818.)

20

As discussed above, the trial court may have erred in admitting the kites against Urzua. It does not follow, however, that the error rendered Urzua's trial fundamentally unfair or that the verdict would have been more favorable to Urzua absent the error. The kites undermined Pimentel's self-defense theory, but it was made clear to the jury that Urzua's trial defense was based on a different premise, namely, that Pimentel shot the victims in a jealous rage. Evidence discrediting Pimentel's self-defense theory would not also tend to discredit Urzua's very different—and indeed conflicting—defense. On this record, we find no reasonable probability that the jury's rejection of Urzua's version of events had anything to do with the kites, and therefore reject his due process claim.

*3.* Batson-Wheeler *Motion (Pimentel and Urzua)*

During jury selection, defendants objected that the prosecutor exercised peremptory challenges against four prospective jurors for group bias against "either black or Hispanic females" in violation of defendants' state and federal constitutional rights. (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) The trial court added a fifth juror to its analysis but denied the motion. On appeal, Pimentel and Urzua challenge the denial as to three of the jurors. We find no error in the trial court's ruling.

*a. Factual Background*

At the end of the 13th day of jury selection, Urzua's attorney made a *Batson-Wheeler* motion, noting that the last four jurors the People had dismissed were black or Hispanic women: Juror 477 (black woman), Juror 682 (Hispanic woman), Juror 255

21

(Hispanic woman), and Juror 250 (black woman). Whether due to confusion or conscious choice, the court construed the motion to include a challenge to a fifth juror who had been dismissed by the People on a peremptory challenge, Juror 428 (Hispanic woman).

The trial court began with Juror 477 and Juror 250, noting that "there are at least two other, possibly three other, black females in the box now."[10] Urzua's attorney contended that the remaining panel members had no bearing on the proper analysis, to which the court responded that "the test of course is whether or not there is a reasonable inference that the peremptory challenge is being exercised solely on the basis of race" and that "one factor in evaluating whether or not that is a reasonable inference is if the prosecution has passed on other members in that class; that perhaps suggests there were other reasons." It then asked the prosecutor to state his reasons for the challenges.

The prosecutor stated four reasons for challenging Juror 477: a reluctance to impose the death penalty, a high degree of confidence in experts and psychologists, family involvement with the criminal justice system, and an expressed interest in hearing the defense's side of the story. The prosecutor also noted that he accepted the panel once with Juror 477 on it before changing his mind.

Juror 250 was struck, the prosecutor stated, due to her prior service on a hung jury and the prior removal of her children by the county.

---

[10] The court used "now" metaphorically; of course, the proceedings regarding the *Batson-Wheeler* motion were held outside the presence of the jury.

The trial court then stated: "So in looking at the totality part which includes that there are other black females still on the panel, and the district attorney has passed once with them on the panel, and in looking at the reasons offered certainly with regard to [Juror] 250, fact that a juror had been on a prior hung jury and had been the subject of children being removed from her home by [the county] are obviously legitimate factors for a prosecutor to take into consideration. Likewise with regard to [Juror] 477. The Court finds the prosecution's explanations for those excusals reasonable. They set forth reasonable reasons that prosecutors often look at in making that determination. And so on balance looking at the totality of the circumstances I'm satisfied there is not an inference or a reasonable inference to be drawn that those peremptory challenges were made on the basis of race. [¶] So the *Batson-Wheeler* motion with regard to black female jurors is denied."

The court then began its analysis as to Juror 682 and Juror 428 without soliciting the prosecution's reasons, noting that those jurors indicated "very strong views against the death penalty" on their juror questionnaires. The court then asked the prosecutor for his reasons for challenging Juror 255. After describing to the court Juror 255's questionnaire responses relating to the death penalty, the prosecutor stated that he "could never get a clear read that she honestly and actually would impose the death penalty." The prosecutor also cited the fact that Juror 255 was searching for employment as well as her potential connections to the Innocence Project, stating that she "did research for the Innocence Project for a school assignment"—a reason that seems to have been related to

her views on or ability to impose the death penalty.[11] The court denied the motion as to these three jurors as well.

The 12 jurors and four alternate jurors who heard the case included two white men, two white women, four black women, three Hispanic men, three Hispanic women, and one Asian man.

### b. Analysis

On appeal, Pimentel and Urzua do not contest the trial court's ruling as to Juror 682 or Juror 428, two of the three Hispanic female jurors. Accordingly, we focus only on Juror 477, Juror 250, and Juror 255. Our analysis in this case can only be performed with a close and detailed review of the jury selection record. Following the standard of review articulated below, we defer to the trial court's conclusions to the extent it made a sincere and reasoned effort to evaluate the proffered reasons, and to the extent those reasons are supported by the record. We ultimately agree with the trial court that none of these peremptory challenges were more likely than not made on account of a protected status.

### (i) Applicable Law

"Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity." (*People v. Davis* (2009) 46 Cal.4th 539, 582.) "Exclusion of even one prospective juror for reasons

---

[11] According to its website, the Innocence Project "exonerates the wrongly convicted through DNA testing and reforms the criminal justice system to prevent future injustice." (The Innocence Project, About<https://innocenceproject.org/about/>.)

impermissible under *Batson* and *Wheeler* constitutes structural error, requiring reversal." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).)

"The high court set forth a three-step framework in *Batson* to determine whether a litigant has violated this right. First, the moving party must establish a prima facie case of discrimination 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the moving party 'makes a prima facie showing, the burden shifts to the [striking party] to come forward with a neutral explanation for challenging' the prospective juror in question. [Citation.] Third, if the proffered justification is race-neutral, then the court must consider whether the movant has proved it was more likely than not that the peremptory challenge was based on impermissible discrimination." (*People v. McDaniel* (2021) 12 Cal.5th 97, 121-122 (*McDaniel*).) "The three-step procedure also applies to state constitutional claims." (*People v. Lenix* (2008) 44 Cal.4th 602, 613.)[12]

This case involves only the third step. "By asking the prosecutor to explain the peremptory challenges, the trial court here implicitly found that defendant had made a prima facie showing." (*People v. Jurado* (2006) 38 Cal.4th 72, 104.)

---

[12] Because the People have not raised it, we do not address the issue of whether "either black or Hispanic females" is a cognizable group for purposes of a *Batson-Wheeler* analysis. (Compare, e.g., *People v. Motton* (1985) 39 Cal.3d 596, 605-606 [black women constitute a cognizable group] with *People v. Manibusan* (2013) 58 Cal.4th 40, 83 (*Manibusan*) ["Both this court and others have declined to recognize 'minority jurors' as a cognizable group for purposes of a claim that the prosecution has excused a prospective juror for discriminatory reasons"].) Instead, we, like the trial court, will treat the motion as two separate ones, one on the basis of black female jurors and one on the basis of Hispanic female jurors.

"At step three, courts look to all relevant circumstances bearing on the issue of discrimination. [Citation.] Relevant circumstances may include the race of the defendant, the ultimate racial composition of the jury, the pattern of strikes, and the extent or pattern of questioning by the prosecutor during voir dire." (*McDaniel*, *supra*, 12 Cal.5th at p. 122.) "The prosecutor's justification does not have to support a challenge for cause, and even a trivial reason, if genuine and race neutral, is sufficient. The inquiry is focused on whether the proffered neutral reasons are subjectively *genuine*, not on how objectively reasonable they are. The reasons need only be sincere and nondiscriminatory." (*People v. Melendez* (2016) 2 Cal.5th 1, 15 (*Melendez*).) "The high court has also held that comparative juror analysis may be probative of purposeful discrimination at *Batson*'s third stage." (*McDaniel*, *supra*, 12 Cal.5th at p. 122; see also *Miller-El v. Dretke* (2005) 545 U.S. 231, 241 (*Miller-El II*) ["If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step"].)

"When a reviewing court addresses the trial court's ruling on a *Batson*/*Wheeler* motion, it ordinarily reviews the issue for substantial evidence." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1159.) "We defer to a trial court's ruling only if the court has made a '"sincere and reasoned effort to evaluate the nondiscriminatory justifications offered"' by the prosecutor." (*McDaniel*, *supra*, 12 Cal.5th at p. 122.) "A court may make a sincere and reasoned effort to evaluate a peremptory challenge even if it does not provide a

26

lengthy and detailed explanation for its ruling. [Citations.] Under our precedent, '[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we . . . assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their credibility." (*People v. Baker* (2021) 10 Cal.5th 1044, 1077-1078.) However, when "'the proffered reasons lack[] inherent plausibility or [are] contradicted by the record,' the court's failure to probe, or to explain, may eliminate the basis for deference." (*Id.* at p. 1078.) "The defendant has the ultimate burden of persuasion." (*Melendez*, *supra*, 2 Cal.5th at p. 14.)

### (ii) Juror 477

As noted, the prosecutor gave four reasons for striking Juror 477: reluctance to impose the death penalty, confidence in experts and psychologists, family involvement with the criminal justice system, and an interest in hearing the defense's story.

### a) Death Penalty Views

Question 12 on the juror questionnaire asked prospective jurors to indicate the group that best described their feelings and attitudes regarding the death penalty, ranging from "Group 1," which contained statements such as "I strongly favor the death penalty," to "Group 5," which contained statements such as "I strongly oppose the death penalty." Juror 477 did not indicate which of the groups best described her views on the subject. At one point during voir dire, the prosecutor asked her about the omission: "You left that

27

blank.  As I was wondering as you sit here today, would you put yourself in one of those groups?"  She responded:  "I'm willing to consider."

Question 22 of the questionnaire asked:  "For what kinds of crimes, if any, do you believe the death penalty should be imposed?"  Juror 477 wrote:  "Child molestation, robbery where lives (innocent) are lost."

Question 24 asked:  "Which punishment do you think is worse for the defendant," with options to choose either death or life in prison without the possibility of parole. Juror 477 indicated that life in prison without the possibility of parole was worse, explaining that "they get to relive all the crimes in their heads and think about the families left behind missing their love [*sic*] ones."

The prosecutor stated his concerns about Juror 477's reluctance to impose the death penalty:  "I—my scale is one through five, one being completely going for the death penalty and the other—five being completely against it.  I had her as a four.  I had concerns on certain areas.

"Initially she said she agrees, she agrees.  She didn't circle one of the groups, which caused me some reservation right from the beginning because I do find that as an initial factor.  We talked to her about it and I think she put herself around a three.  That was a concern of mine.

"The other concerns that I had were the time for death penalty were child molestation, robbery, where lives of innocents are lost, which is obviously different from our case.  So that was another issue that caused me some concern with her.  She also has,

28

'Life in prison without possibility is worse,' and that also is a reservation that I always have. 'They get to relive all the crimes they have in their heads and think of what they left behind.' Even though we tell them not to consider that as a factor—you have to consider DP worse than LWOP—they think, well, I'm punishing them because I'm giving them LWOP and not death."

"A juror's reservations about imposing the death penalty are an acceptable race-neutral basis for exercising a peremptory." (*People v. Armstrong* (2019) 6 Cal.5th 735, 770.) Here, the prosecutor noted his concerns about Juror 477 with regard to the death penalty: her initial failure to answer question 12 on the juror questionnaire, her failure to include murder in a list of crimes she believed were deserving of the death penalty, and her view that life without the possibility of parole was a worse punishment than death. These supported the prosecutor's apprehension that she might be reluctant to vote for death.

As defendants note, Juror 477 stated during voir dire that she understood that the choice between death and life without the possibility of parole would not depend on her personal feelings. But this statement may have not been enough to assuage the prosecutor's concern in light of her other statements and omissions, and our "inquiry is focused on whether the proffered neutral reasons are subjectively *genuine*, not on how objectively reasonable they are" (*Melendez*, *supra*, 2 Cal.5th at p. 15). As the prosecutor himself stated, "[e]ven though we tell them not to consider that as a factor—you have to

29

consider [the death penalty] worse than [life without the possibility of parole]—they think, well, I'm punishing them because I'm giving them LWOP and not death."

Defendants also note that other jurors who were seated made similar statements, such as indicating that life without the possibility of parole was worse than death or omitting murder in a list of crimes deserving of death. However, it was quite plausible that "these jurors' questionnaire responses differed from [Juror 477]'s in ways the prosecutor could well have regarded as significant." (*People v. Smith* (2018) 4 Cal.5th 1134, 1153, fn. 3.) Two jurors, for example, did not specifically list murder as a crime for which the death penalty should be imposed. However, one of those jurors, Juror 165, wrote "serious crime" as his answer for question 22 (asking which are appropriate crimes for the death penalty), and this generic response could well encompass murder, and Juror 165 did not indicate that life in prison without the possibility of parole was always worse than death. (For that question, Juror 165 put a mark next to both death and life in prison without the possibility of parole, and wrote: "Both, matter of opinion.")

The other seated juror, Juror 647, answered "none" for question 22 and indicated that life without the possibility of parole was worse than death. A comparison of Juror 477 and Juror 647—who was also a black woman—could reasonably lead to two different conclusions about their views on the death penalty, but *both* conclusions support the denial of the *Batson-Wheeler* motion. The first is that Juror 477 and Juror 647 had substantially different views on the death penalty, notwithstanding their responses regarding crimes deserving of death and whether death was the harsher punishment. For

30

example, for question 12, Juror 647 placed herself in "Group 2," which contained the statement: "I favor the death penalty . . . ." This response, along with others, could have placated any concerns about the death penalty the prosecutor may have had with Juror 647.

Another way of evaluating the comparison between Juror 477 and Juror 647 would be to conclude that they are alike, in that they are both black women who consider life without parole a worse punishment and do not view murder as deserving of the death penalty. If this is the case, however, it would *also* undercut defendants' argument that Juror 477 was struck for impermissible reasons, as Juror 647 ultimately sat on the jury. In other words, to the extent that Juror 647 and Juror 477 are alike based on their gender, race, and potential views on the death penalty, the prosecutor's inclusion of one and strike of another is evidence that the strike against Juror 477 was exercised for one of the reasons that the prosecutor gave, rather than out of group bias.

In sum, we reject defendants' comparisons between Juror 477 and other jurors on this issue and find that the trial court's findings were supported by substantial evidence.[13]

---

[13] We note that defendants' factual assertions with regard to comparative analysis are at times unreliable. For example, defendants asserted that "[t]hree other jurors indicated they thought LWOP was or could be worse than death," citing Juror 201, Juror 670, and Juror 701 as examples. Juror 201, a black woman who served as an alternate, did indicate on question 24 that she believed life without the possibility of parole was worse than death. Juror 670, however, indicated that death was a worse punishment in response to question 24, although she wrote in response to another question that life without the possibility of parole "could be worse punishment than death." If Juror 670's response to a separate question should be considered here, then likely so should Juror 165's response, noted above, that both death or life without parole could be worse as a

31

*b) Mental Health Professionals and Expert Testimony*

The prosecutor's second concern with Juror 477 was that "she has a lot of confidence in psychologists" and that she "would likely believe or disbelieve anything an expert said." This was an accurate characterization of Juror 477's responses. Question 47 of the questionnaire asked: "In general, how much confidence do you have in psychiatrists, psychologists, and other mental health professionals?" Juror 477 wrote: "A lot." Additionally, question 49(c) asked: "Would you <u>automatically</u> believe or disbelieve anything an expert said merely because the person claims to be an expert?" Juror 477 marked the space next to "Yes."

There were two seated jurors who gave comparable answers on their questionnaires, but comparative analysis yields a less than clear result. The two other jurors who gave similar answers to both questions were (again) Juror 165 and Juror 647. In response to question 47, Juror 165 wrote "some, they are professionals," and in response to question 49(c), Juror 165 marked "Yes." Similarly, Juror 647 wrote "much confidence" in response to question 47 and marked "Yes" to question 49(c). During voir dire, the prosecutor questioned Juror 165 about those responses over the course of six

---

"matter of opinion." And Juror 701 was never seated as a juror or as an alternate, and thus the fact she (like Juror 477) thought life without the possibility of parole was worse does not meaningfully add to defendants' argument. Additionally, defendants neglected to mention that Juror 123, Juror 566, Juror 647, and Juror 715—who were all seated as jurors—also indicated in response to question 24 that life without the possibility of parole was worse than death.

pages of the trial transcript.[14]  However, the prosecutor asked no questions about those portions of the questionnaire with Juror 647 or Juror 477.

The United States Supreme Court has recognized the inference a reviewing court can draw from inconsistent questioning on a topic that the state claims is important.  In *Miller-El II*, the Court concluded that a prosecutor's rationale for exercising a peremptory strike was "unsupportable" because, although the prosecutor asked the excused juror about an issue of concern, it did not do the same with other jurors whose responses should have raised the same concern.  (*Miller-El II*, *supra*, 545 U.S. at p. 246.)  That inconsistency was concerning, the Court stated, because "[i]f, indeed, [the excused juror]'s thoughts on [the issue] did make the prosecutor uneasy, he should have worried about a number of white panel members he accepted with no evident reservations."  (*Id.* at p. 244; see also *Ex parte Travis* (Ala. 2000) 776 So.2d 874, 881 ["[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination"], cited in *Miller-El II*, *supra*, at p. 246.)

Here, *Miller-El II* suggests that the prosecutor may not have been genuinely worried about an overreliance on experts or mental health professionals because although

---

[14]  A portion of that exchange reads:  "[Prosecutor:] I want to make sure that you feel comfortable enough that we just don't automatically accept whatever comes out of someone's mouth because they say they're an expert.  [¶]  You feel you can feel comfortable doing that?  [¶]  PROSPECTIVE JUROR No. 165:  Yes."

the prosecutor asked Juror 165 questions about it, he did not do the same with Juror 477 before excusing her.

Juror 647, however, complicates that analysis. As noted, Juror 647, a black woman, wrote that she had "much confidence" in mental health professionals and that she would "automatically believe or disbelieve anything an expert said merely because the person claims to be an expert" (underlining omitted). Thus, Juror 647 and Juror 477 are all but identical in this respect, yet Juror 647 was ultimately seated on the jury, while Juror 477 was excused.

One possible explanation for this muddled set of circumstances is that the prosecutor's purported reliance on responses relating to mental health professionals and other experts was indeed a subsequently manufactured, rather than actual, reason for the challenge to Juror 477, but that it nevertheless was not a pretext for discriminating against black women. Another possible explanation, equally unsatisfying, would be that the prosecutor's inconsistency was inadvertent, given the hundreds of potential jurors screened. We do not have to conclude one way or the other here, however. At a minimum, the evidence on this issue does not show that the prosecutor used reliance on expert testimony as a pretext to discriminate *against black women*.

c) *Family Involvement with the Criminal Justice System*

The prosecutor's explanation for his third reason for striking Juror 477 was succinct: "She had some siblings that had criminality." In response to question 42 of the

34

questionnaire ("Has anyone close to you ever been arrested, accused of a crime, or prosecuted?"), Juror 477 marked the space next to "Yes" and wrote: "A sibling."

The dilemma here is the same: although the prosecutor cited this as a reason for striking Juror 477, *six* of the 16 seated and alternate jurors also answered "Yes" to question 42 and listed family members. Of those six, *two* were black women. None of the parties have pointed us to any portion of the trial record where the prosecutor might have asked follow-up questions on this topic from any of these jurors.[15]

In its brief, the People state that "[n]otably, all but Juror 477 and Juror 605 provided additional information about the crime when answering the question." But even taking this as true, it does not help the People. For one, the prosecutor did not cite a lack of additional information here as a reason for striking Juror 477 the same way he did with her failure to place herself into a death penalty group. (See *Miller-El II*, *supra*, 545 U.S. at p. 252 ["a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility *of the reasons he gives*"], italics added.) For another, as the People themselves note, Juror 605 also did not give information about the crime (he only wrote "[o]ne of my sons"), yet he was seated on the panel.

---

[15] The respondent's brief makes reference to a brief exchange during voir dire in which the prosecutor asked Juror 477 if she had any family member accused of being in a gang, and she said she had a cousin so accused, but "[t]hat was their personal opinions. I just seen him as my cousin." The prosecutor's reference during the *Batson-Wheeler* motion to Juror 477's "siblings," however, strongly suggest he was referring to Juror 477's questionnaire response, not the voir dire exchange. In any event, the People do not argue that the voir dire exchange would have provided a justifiable reason for striking Juror 477.

35

Ultimately, we reach the same, limited conclusion: whatever the comparative analysis and other evidence on this issue might show, it does not show that the prosecutor used family involvement with the justice system as a pretext to discriminate against black women.

### d) Desire to Hear Defendants' Side of Story

The prosecutor explained his fourth and final reason for striking Juror 477—a desire to hear defendants' versions of events—as follows: "If you look at the last page, would you like to be a juror, 'curious to hear their side of the story.' And so, even though the defense may look at that as a way of saying, oh, well, she's trying to burden shift, I look at more, well, she's interested in what the defense has to say. Now that may be an amicable quality, but as a prosecutor, I don't want people that are interested in what the defense has to say because I would like them to be more inclined to what I have to say. So that obviously is a concern that I have. I obviously prefer things differently sometimes in how they say it than the defense would, but that was my concern with her." In response to question 95 of the questionnaire ("Would you like to be a juror on this case?"), Juror 477 marked the space next to "Yes" and wrote: "Curious to hear their side of the story."

None of the jurors who heard the case made similar remarks about wanting to hear defendants' version of events. Defendants contend that the prosecutor's reason here was not genuine, both because (in defendants' words) an "ideal juror listens to all the evidence, including any defense evidence" and because this and other responses

36

suggested that Juror 477 expected the defendants to prove their innocence, "a trait more commonly objectionable to the defense than to the prosecutor."

As we have noted, however, the step three inquiry does not focus on how "objectively reasonable" a proffered reason is, only whether it is "subjectively genuine." (*Melendez*, *supra*, 2 Cal.5th at p. 15, italics omitted.)  Although whether an argument is subjectively genuine in turn depends, at least partially, on reasonableness—because "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination" (*Purkett v. Elem* (1995) 514 U.S. 765, 768 (*per curiam*))—it does not matter whether the prosecutor seeks "ideal" jurors, either from a prosecutor's vantage point or society's.

"So, for example, if a prosecutor believes a prospective juror with long, unkempt hair, a mustache, and a beard would not make a good juror in the case, a peremptory challenge to the prospective juror, sincerely exercised on that basis, will constitute an entirely valid and *nondiscriminatory* reason for exercising the challenge.  [Citation.]  It matters not that another prosecutor would have chosen to leave the prospective juror on the jury.  Nor does it matter that the prosecutor, by peremptorily excusing men with long unkempt hair and facial hair on the basis that they are specifically biased against him or against the People's case or witnesses, may be passing over any number of conscientious and fully qualified potential jurors.  All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924 (*Reynoso*).)

37

Here, we see no basis to distinguish the reasoning stated in cases such as *Melendez* and *Reynoso*. The fact that the prosecutor did not want jurors who sought to hear the defendants' versions of events may well have meant excusing "fully qualified potential jurors" (*Reynoso*, *supra*, 31 Cal.4th at p. 924). And the prosecutor acknowledged this as well, telling the trial court that even though Juror 477's response demonstrated an "amicable quality," he preferred jurors who would have been "more inclined to what [he had] to say." However, we see nothing to suggest that this proffered concern was a pretext for discrimination.

### e) Other Evidence

Having concluded that none of the individual reasons the prosecutor gave for striking Juror 477 were a pretext for discrimination against black women, we note two additional reasons why we believe defendants have not met their burden of showing impermissible discrimination.

The first reason is that neither Pimentel nor Urzua share either the race or the gender of the identified group. "No doubt, a litigant may raise a *Batson*/*Wheeler* objection regardless of the race of the defendant or the victim." (*People v. Baker*, *supra*, 10 Cal.5th at p. 1080.) But the fact that neither defendant is "a member of any of the actual or assumed cognizable groups involved . . . [is] a factor that, because it is absent, fails in this case to support an inference of discrimination." (*People v. Bell* (2007) 40 Cal.4th 582, 600, disapproved on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; see also *People v. O'Malley* (2016) 62 Cal.4th 944, 980 [noting that the

case "did not involve a situation in which '[r]acial identity between the defendant and the excused person,' or between the victim and the majority of remaining jurors, raises heightened concerns about whether the prosecutor's challenge was racially motivated"].)

The second reason is that the ultimate racial composition of the jury strongly suggests that the prosecutor did not harbor bias against black women. (See *McDaniel*, *supra*, 12 Cal.5th at p. 122 [relevant circumstances to consider at step three include "the ultimate racial composition of the jury"].) Here, of the 16 jurors and alternate jurors, four—or one quarter—were black women. No other group based on race and gender had as many jurors. (Two groups had three members: Hispanic women and Hispanic men.) Additionally, the fact that the People accepted the panel when it had enough remaining peremptory challenges to strike the four black women suggests that the prosecutor did not harbor bias against them. (See *id.* at p. 124; see also *ibid.* [noting that "the final racial composition of the jury was diverse and contained more Black jurors than jurors of any other race"].)[16]

In sum, we find no error in the trial court's denial of defendants' *Batson-Wheeler* motion as to Juror 477.

### (iii) Juror 250

The prosecutor gave two reasons for striking Juror 250: the fact that "she had been on a hung jury before with molestation," and that "[s]he implicated her children

---

[16] The People ultimately exercised 23 of their 30 allowed peremptory challenges. (See Code of Civ. Proc., § 231, subd. (a) [in a capital case with two defendants, the prosecution has 30 peremptory challenges total].)

were removed by the courts," which concerned the prosecutor "because obviously it was in this county."

On appeal, defendants acknowledge that prior service on a hung jury can be a legitimate reason for excusing a juror. (See *Manibusan*, *supra*, 58 Cal.4th at p. 78 ["Of course, the circumstance that a prospective juror has previously sat on a hung jury is a legitimate, race-neutral neutral reason for exercising a strike"].) Defendants note that no other jurors who heard the case reported serving on a hung jury. As well, defendants do not argue that prior removal of a juror's children would be an improper reason for excusing a juror.

Defendants argue that Juror 250 was improperly excused because her answers to other questions would have made her an ideal juror for the prosecution. As noted, however, the fact that the prosecutor's strikes may result in some qualified potential jurors from serving does not, by itself, show improper discrimination. (See *Reynoso*, *supra*, 31 Cal.4th at p. 924.) We therefore find no error with the trial court's ruling on Juror 250.[17]

---

[17] Defendants also contend that the prosecutor's dismissal of Juror 477 and Juror 587 raise an inference of discrimination with regard to Juror 250. We have already rejected the challenge as to Juror 477 above. Any challenge as to Juror 587 is forfeited for defendants' failure to raise it at trial. (See *People v. Bolin* (1998) 18 Cal.4th 297, 317.)

*(iv) Juror 255*

The prosecutor gave two reasons for excusing Juror 255, a Hispanic woman. First, he stated that he "had an issue of her being unemployed and saying she would stick around here. I tried to go and speak to her about that, it was like, Oh, yeah, just trying to work it out with my employer. I didn't want a situation where she was going to be here and then leave us halfway through."

The second reason was that he "could never get a clear read that she honestly and actually would impose the death penalty." This was based in part on some of her answers to questions regarding the death penalty and in part on her potential connection to the Innocence Project.[18]

---

[18] The prosecutor's remarks were as follows: "Concerns I had with her were she indicated—excepted in very specific instances, meaning to question 15, 'must be 100 percent sure of guilt.' Then she had, in question 20 she indicates what do you believe the purpose of the death penalty is, 'to punish the most heinous of crimes and to balance an order,' which started to worry me about her and her ability to only have the focus on certain types of crimes. Then 23, 24—even though she circled 'yes,' she says, 'I would be reluctant to put a person to death without thinking it over once again. Yet if I believe them guilty, without any doubt would vote for death.' And I just saw this as a person who would go beyond even lingering doubt. She would have to have no doubt in her mind to vote for the possibility of death.

"She did research for the Innocence Project for a school assignment, kind of a thing I'm not really—wouldn't be inclined to keep somebody who is researching for the Innocence Project. It appears to me most Innocence Project situations deal with death penalty cases, and it's not that she's working for the DA's office in trying to help right [*sic*] motions to oppose death verdicts. She's actually working for the Innocence Project as a school assignment. So that caused me a lot of reservation for that.

"There were questions where she marked group two and different things, but those responses were inconsistent with other responses. And I could never get a clear read that she honestly and actually would impose the death penalty."

In denying the motion as to Juror 255, the trial court stated that it was "satisfied that the explanations offered by the prosecution are reasonable explanations, based on question—answers in the questionnaire that reasonably would give a reasonable prosecutor cause for concern." Although we find the issue to be close, we hold that the motion was properly denied.

The first reason the prosecutor gave—employment concerns—was inadequate. For one, the trial court did not rely on this reason in its ruling. For another, there is nothing in the record to substantiate the prosecutor's claim that he spoke with Juror 255 and she said she would "work it out" with her employer.[19] Although we have no reason to disbelieve the prosecutor's assertions, accepting the unsubstantiated statements here— which also seem to have not been observed by the defendants or the trial court—would veer too much toward allowing the prosecutor "to rebut the defendant's case merely by denying that he had a discriminatory motive or '[affirming] [his] good faith in making individual selections,'" which would make "the Equal Protection Clause '. . . a vain and illusory requirement.'" (*Batson*, *supra*, 476 U.S. at p. 98.)

The second reason—reluctance to impose the death penalty—does not appear to be any more supported by the record. In response to question 15 ("What are your general feelings about the death penalty?"), Juror 255 wrote: "Accept it in very specific instances. Must be 100% sure of guilt. Can be convinced to go either way." Juror 255

---

[19] There is a brief voir dire exchange involving Juror 255, but Juror 255 never mentioned an employer then, and it was in response to questions by the trial court, not the prosecutor.

also responded "Yes" to the question: "If you conclude that the defendant is guilty of first-degree murder and that a special circumstance is true, and that a sentence of <u>death</u> is legally warranted in this case, would you be reluctant to personally vote for a sentence of death?"[20] She explained: "I would be reluctant to put a person to death without thinking it over once again, yet if I believe them guilty without any doubt would vote for death."

Portions of these responses, such as the desire to be 100 percent sure of guilt and the stated reluctance to impose the death penalty—which the prosecutor alluded to in his proffered reasons—do support the notion that Juror 255 could have been reluctant to impose the death penalty. (See *Manibusan*, *supra*, 58 Cal.4th at p. 84 [prosecution may properly be concerned if juror states that the "'death penalty <u>must really</u> be warranted'"].) Comparative analysis, however, reveals that at least one other juror made substantially similar remarks. Juror 8, a white man who sat on the jury, also marked "Yes" in response to the question about reluctance and explained: "I would want to be 100% sure that the evidence is accurate before voting for death." Both also mentioned that the death penalty applied to "heinous" crimes: Juror 255 wrote that the purpose of the death penalty was "[t]o punish the most heinous of crimes and to keep balance and order," and Juror 8 wrote that the death penalty was "an appropriate sentence for heinous crimes." Additionally, Juror 8, like Juror 255, put himself in "Group 2," something the prosecutor

---

[20] This question, like another question discussed above, was enumerated as question 24 on the questionnaire.

stated made (only) Juror 255 "inconsistent" and therefore a concern.[21] In light of the prosecutor's proffered reasons and a comparative analysis of Juror 255 and Juror 8 focusing on those reasons, we decline to credit the prosecutor's reliance on Juror 255's questionnaire responses regarding a potential reluctance to impose the death penalty.[22]

The only substantive difference between Juror 255 and Juror 8 in this area was Juror 255's connection to the Innocence Project. In response to question 63 ("Have you ever visited any internet web sites dealing with victims of crime, law enforcement, or the criminal justice system?"), Juror 255 marked the space next to "Yes" and wrote: "Researched the innocence project for a school assignment." Although Juror 8 also marked "Yes" to the same question, he wrote: "I've visited the SB court Open Access site to review divorce [illegible text] some of my ex-wife's charges."

While giving his proffered reasons, the prosecutor appears to have overstated Juror 255's connections to the Innocence Project. Although Juror 255 only stated that she researched the organization for a school assignment, the prosecutor stated that she was "researching *for* the Innocence Project" (italics added) and that "[s]he's actually working

---

[21] Other seated jurors made remarks suggesting they might require a higher standard of proof than proof beyond a reasonable doubt, but we focus here on Juror 8, whose responses on these questions were the most similar to Juror 255.

[22] Although both the trial court and the prosecutor asked Juror 255 questions about her ability to impose the death penalty, the prosecutor's proffered reasons for excusing Juror 255 made no reference to those questions or responses and instead relied only on her questionnaire responses. In any event, Juror 255 repeatedly stated during questioning that she would have no problem weighing the aggravating and mitigating factors during a penalty phase.

44

for the Innocence Project as a school assignment." Unlike Juror 255's questionnaire responses, the prosecutor's statements implied that Juror 255 had taken a position at the organization, even if a temporary one, as part of a school assignment. Moreover, no one asked Juror 255 any follow-up questions about her response to this question or about the Innocence Project. The prosecutor's proffered reasons for excusing Juror 255 based on her connection to the Innocence Project were therefore not supported by the record.

The insufficiency of the prosecutor's proffered reasons for excusing Juror 255 is troubling. The reasons given were either unsupported by the record or were unproblematic as to other, non-Hispanic female jurors who heard the case. We ultimately find, however, that "the fact that the prosecution accepted a panel with [three Hispanic female] jurors when it had enough remaining peremptory challenges to strike them" (*McDaniel*, *supra*, 12 Cal.5th at p. 124) is heavily probative here. As we have noted, of the group of 16 sitting and alternate jurors, only one group based on race and gender had more members (four black women), and the only other group to have the same number of members was Hispanic men.[23] As our Supreme Court has recently shown, the final composition of the jury can be a highly significant factor. (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 842 (dis. opn. of Liu, J.) [noting, in dissenting opinion in a step one case, that the majority "relies on the final composition of the jury, which included four Black women, and the fact that the prosecutor had sufficient

---

[23] If the cognizable group were instead "either black or Hispanic females," as defendants stated when bringing the *Batson-Wheeler* motion, then seven of the 16 sitting and alternate members of the jury, or nearly half, would have been members of the group.

peremptory challenges remaining to strike them at the time he accepted the jury"].)

Under these circumstances, even though the prosecutor's proffered reasons were not supported by the record, defendants have not demonstrated that the genuine reasons were discriminatory, so their *Batson-Wheeler* motion was properly denied.

## B. Guilt Phase Issues

### 1. Motion for Mistrial (Pimentel)

Pimentel argues that Urzua's attorney committed misconduct during his closing argument by stating his (the attorney's) personal belief in Pimentel's guilt and that the trial court erred when it denied Pimentel's motion for mistrial on the same ground. We find the contention meritless.

#### a. Additional Factual Background

Pimentel's argument here is based on several related statements made by Urzua's attorney. For context, we include the relevant portion of the attorney's closing argument:

"I told you from the beginning that I think the best theory is jealousy. I told you it's my theory, but I tried to give you facts that supported it. We know that jealousy is one of the most common reasons why people get killed. I suspect that's what happened here. Now, this is CALCRIM 370, basically it says you can consider if someone has a motive and you can consider if they don't have a motive. I just talked a while why my client doesn't have a motive. I think the codefendant may have had motive.

"Cynthia Urzua came and testified. She testified three times, I think. When I had her testify, she said Pimentel was jealous and beat her up at least ten times just over

46

jealousy. She talked about one incident where she had a baby that was a few weeks old and he slapped her while the baby was in her arms and pulled her by the hair and dragged her across the floor. Now, a lot of people get jealous. We all get jealous; right? Most people don't slap a woman just after they had a baby and drag her by the hair. She said there were nine other incidents.

[¶] . . . [¶]

"[W]e know that Cynthia was on Facebook. We know she was Facebook friends with Mr. Pimentel. We know that she was Facebook friends with Jesus Tiburcio. Jesus is giving her a message that, Damn you looked good back then, ha-ha. If you think about what you know about jealous men who beat up girls, it's not a good idea to go talk to a woman next to her man and say you look hot.

"If he's a jealous guy, he may take that personally. He may not like that. What else do we have? We have Mr. Tiburcio, himself. There were injuries here. [A witness] testified that those could be up to 24 hours old, but they could have been as recently as the incident where he got shot. And you see one, two, three. I believe the best explanation for those marks is that Pimentel took the shotgun and hit him in the head three times. I think that he rushed Pimentel after Pimentel killed Contreras. When he hit him with that shotgun, I think that's probably what caused the shotgun to jam. That's speculation, but it's an inference based on the facts. [¶] But I don't think he needed to hit him three times. I think the extra hit had something to do with jealousy or rage."

47

Urzua's attorney then discussed a recorded phone call between Pimentel and Cynthia that took place after Pimentel had been arrested. The attorney played a tape of the call, a portion of the transcript of which we recited earlier but state here again for reference:

"Emmanuel Pimentel: I, I need a place . . .

"Cynthia Urzua: You think I like fucking seeing my brother in there?

"Emmanuel Pimentel: No. No[.]

"Cynthia Urzua: You think I like to [*sic*] fucking fact that my kids are never going to fucking see their dad?

"Emmanuel Pimentel: Well you should have thought about things . . .

"Cynthia Urzua: Honestly, I haven't thought about fucking shit Manny.

"Emmanuel Pimentel: Laughs

"Cynthia Urzua: Hello, this is all fucking you.

"Emmanuel Pimentel: You should have thought about things first man.

"Cynthia Urzua: I should have fucking thought about shit. Stop fucking trying to make me fucking feel guilty for whatever the fuck you are fucking going through right now, alright?

"Emmanuel Pimentel: I'm not, I'm not.

"Cynthia Urzua: I'm tired of your fucking trying to fucking make me feel guilty about everything."

Immediately before playing the tape, Urzua's attorney stated: "So I'm telling you when I say—you should have thought about things, I mean, to me, it screams out that he's blaming her." After playing the tape, Urzua's attorney continued:

"That's her. That's not me. Here are my conclusions: Pimentel is blaming Cynthia for something; right? She had nothing to do with the kidnapping. . . . [¶] I have already told you why I think the gang theory is absurd. But let's presume that he was ordered by his gang, somehow, to go over and kill those three men. If the gang ordered him to do it, why would he blame her for that? She's not part of the gang. She's not part of the OG's in the gang. But we know she had contact with Jesus Tiburcio. We know she Facebooked him. In the context of what has occurred, in the context of what she's saying, doesn't this make the most sense? Stop fucking blaming me. Why is he blaming her? He's blaming her because he got mad at Tiburcio. He got jealous about something and he killed her (sic). [¶] I think that's the most reasonable conclusion."

### b. *Applicable Law and Discussion*

"'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the *federal* Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'"' [Citations.] Under *state law*, a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial.'" (*People v. Lopez* (2008) 42 Cal.4th 960, 965 (*Lopez*).) Along similar lines, "it is clear that the conduct of counsel for a codefendant can violate a

defendant's constitutional rights." (*People v. Estrada* (1998) 63 Cal.App.4th 1090, 1095 (*Estrada*).)

"'A prosecutor [or other opposing attorney] may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial.' [Citations.] The danger that the jury will view [counsel's] expressed belief in the defendant's guilt as being based on outside sources 'is acute when the [counsel] offers his opinion and does not explicitly state that it is based solely on inferences from the evidence at trial.' [Citation.] Nevertheless, not all such comments are improper. Rather, '[counsel's] comments must . . . be evaluated in the context in which they were made, to ascertain if there was a substantial risk that the jury would consider the remarks to be based on information extraneous to the evidence presented at trial.'" (*Lopez*, *supra*, 42 Cal.4th at p. 971.)

Although Urzua's attorney undoubtedly expressed personal opinions (for example, by saying "I believe the best explanation for those marks is that Pimentel took the shotgun and hit him in the head three times"), the comments were not improper.

For one, Urzua's attorney twice expressly noted that his view was based on the evidence. He stated, for example, that "I told you from the beginning that I think the best theory is jealousy. I told you it's my theory, but I tried to give you facts that supported it." Later on, he stated: "I think that [Tiburcio] rushed Pimentel after Pimentel killed

50

Contreras. When he hit him with that shotgun, I think that's probably what caused the shotgun to jam. That's speculation, but it's an inference based on the facts."

For another, there is no reason to suspect that the comments were "'based on information other than evidence adduced at trial'" (*Lopez, supra*, 42 Cal.4th at p. 971). Urzua's attorney expressly stated that his opinions were based on the evidence. Pimentel's conclusory assertion to the contrary is unsupported by the record.

Additionally, after denying Pimentel's mistrial motion, the trial court admonished the jury. It stated: "Before [the attorney] resumes with his closing statement, I just want to advise you that during all of the attorneys' closing statements, they are permitted to talk about the evidence, obviously, and what they believe the evidence either does or does not show or what are or are not reasonable inferences or conclusions from the evidence. But the attorneys are not permitted, and it's improper for attorneys to give their own personal opinion or their own personal beliefs or vouch for or against a particular witness or testimony. [¶] So whenever it seems that an attorney is doing that, you should treat those statements as being their argument as what the evidence shows, not their own personal opinion or their own personal belief." Pimentel does not attempt to demonstrate why the admonition would not have cured the defects he alleges.

Pimentel's reliance on *Estrada* is misplaced. There, the Court of Appeal found that a defendant's due process rights were violated when his codefendant's counsel "engaged in repeated inflammatory and prejudicial misconduct" (*Estrada, supra*, 63 Cal.App.4th at p. 1095) and that the counsel's "comments concerning appellant's prior

51

arrests, his suggestion that other evidence not presented at trial showed appellant's guilt, his suggestion appellant's failure to testify at [the co-defendant's] preliminary hearing was relevant to his credibility, his use of appellant's prior convictions to suggest appellant had a propensity to commit crimes, and his suggestion appellant's own attorney did not believe him were all highly improper" (*id.* at p. 1106). Here, far short of demonstrating that Urzua's counsel engaged in several different types of misconduct, Pimentel argues only that Urzua's counsel suggested that evidence not produced at trial pointed to Pimentel's guilt, itself a meritless contention, as discussed above.

We also reject Pimentel's conclusory contention that the trial court should have also instructed the jury against concluding that Urzua's attorney's statements were based on anything Urzua said out of court. Not only is it forfeited for lack of any discussion or citation to authority (see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 ["If a party's briefs do not provide legal argument and citation to authority on each point raised, '"the court may treat it as waived, and pass it without consideration"'"]), the court essentially instructed the jury to not base closing argument comments on any out-of-court statements by instructing that it "should treat [counsel's] statements as being their argument as what the evidence shows." We find no error in the trial court's denial of Pimentel's motion for mistrial.

### 2. *Inclusion of pre-*Miranda *Statement (Urzua)*

Urzua contends that the admission of a photograph of an envelope from Urzua's gunshot residue ("GSR") test during trial violated his right against self-incrimination.

Specifically, he contends that a notation on the envelope indicating that Urzua had last washed his hands "'approx. 2-3 hours'" before the test was administered should not have been admitted. The test came back negative.

The People implicitly concede that Urzua's statement of when he last washed his hands was made prior to any *Miranda* warnings but argue that the statement fell under the booking exception. The People also argue that, even if the exception does not apply, the admission of the statement was harmless beyond a reasonable doubt. We assume without deciding that the booking exception does not apply and find that its admission, even if wrongful, was harmless.

Under the booking exception, no *Miranda* warnings are required "for a limited category of booking questions involving biographical data . . . and admission of the defendant's answers at trial does not violate the Fifth Amendment." (*People v. Elizalde* (2015) 61 Cal.4th 523, 531 (*Elizalde*).) "For questions outside this limited category, however, answers given, without an admonition, to questions an officer should know are reasonably likely to elicit an incriminating response may not be admitted in the prosecution's case-in-chief." (*Id.* at pp. 531-532, fn. omitted.) This is because "broader questioning during the booking process may elicit incriminating responses depending on the circumstances," and "unadmonished custodial interrogation implicates the Fifth Amendment." (*Id.* at p. 536.)

For example, our Supreme Court held in *Elizalde* that "routine questions about gang affiliation, posed to [a] defendant while processing him" and asked "for institutional

53

security purposes," "exceeded the scope of the exception." (*Elizalde*, *supra*, 61 Cal.4th at p. 527.) Although "'[d]isclosure of [one's] name and address is an essentially neutral act,'" questions about gang affiliation exceeded the scope of the exception because the "officers should have known [such] questions were reasonably likely to elicit an incriminating response because of California's criminal gang statutes and defendant's pending charges." (*Id.* at pp. 535, 527.)

We need not address here whether information about when an individual last washed his or her hands for purposes of a GSR test is the kind of biographical data that falls within the booking exception, or whether it is likely to elicit an incriminating response depending on the circumstances. Even assuming the information was erroneously admitted, its admission was harmless beyond a reasonable doubt.

"The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18. [Citations.] That test requires the People here 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*Elizalde*, *supra*, 61 Cal.4th at p. 542.)

The People satisfy that burden here. Urzua's statement that he had last washed his hands approximately two to three hours prior, when considered with the timing of other events that night and the uncontroverted testimony of the forensic specialist who elicited the statement from Urzua and performed the GSR test, means that the only reasonable inference the jury could draw from the statement was that he last washed his hands prior

to meeting the three victims. This, along with the fact that the test came back negative, means that the statement could not have implicated his guilt in any meaningful way.

One witness testified that she saw Urzua and Pimentel walk past her mobile home at about 6:00 p.m. Another witness testified that she heard a loud bang she thought was fireworks after 7:00 p.m. Police were dispatched to the area at around 7:08 p.m. Urzua was taken into custody at approximately 7:23 p.m. following defendants' initial contact with police and Pimentel's attempted flight from the scene on foot. The forensic specialist who performed Urzua's GSR test testified that he obtained the sample (and asked Urzua when he last washed his hands) at the San Bernardino Police Department before heading to a location on 17th Street to take photographs. The forensic specialist testified that he arrived at the 17th Street location at approximately 8:50 p.m.

The only reasonable conclusion the jury could have drawn from the hand washing statement and these witnesses' testimony, which Urzua does not dispute with any citation to the record, was that Urzua had last washed his hands prior to meeting Tiburcio, Sanchez, and Contreras. As such, there is no plausible way that the hand washing statement would have made the evidence more incriminating than if it had been excluded. If anything, the statement would have been evidence tending to show innocence, a point Urzua's attorney understood—and expressed—to the jury during closing argument: "We know every time you shoot a gun, gunshot residue comes out. We know if you shoot a gun, handle a gun, or here is a good one, are near a gun when it's operated, you can get it on your body. We know every time you shoot a gun, it comes out. Three different times,

three different opportunities.  He doesn't have to shoot a gun if he's close to it.  There is zero gunshot residue on my client.  The lack of evidence sometimes is very strong evidence."

Accordingly, whether or not Urzua's statement about his last hand washing fell under the booking exception, its admission into evidence was harmless beyond a reasonable doubt.

*3.  Sufficiency of the Evidence on Counts 1 and 2 as an Aider and Abettor (Urzua)*

Urzua contends that the evidence was insufficient to convict him of Sanchez's and Tiburcio's murders (counts 1 and 2) on an aiding and abetting theory.  He does not challenge the sufficiency of the evidence on his conviction for Contreras's murder (count 3), which was pursued on a direct perpetrator theory.  We hold that the evidence was sufficient.

"'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.'"  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117, citing § 31.)  "Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts."  (*Id.* at p. 1117.)  "'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."'"  (*People*

*v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) As is the case here, "'[w]hen the offense charged is a specific intent crime,'" and "when the charged offense and the intended offense . . . are the same, . . . the aider and abettor must know and share the murderous intent of the actual perpetrator." (*People v. McCoy*, *supra*, at p. 1118.)

"'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact.'" (*Nguyen*, *supra*, 61 Cal.4th at p. 1054.) "Factors to be considered by the trier of fact in determining 'whether one is an aider and abettor include presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, companionship, flight, and conduct before and after the crime.'" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.)

"'"""When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.""" [Citation.] 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.'" (*Nguyen*, *supra*, 61 Cal.4th at pp. 1054-1055.) Additionally, "[a]ppellate inquiry into the sufficiency of the evidence 'does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt.'"  (*Id.* at p. 1055, citing

*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)

Urzua's liability as an aider and abettor in Sanchez's and Tiburcio's murders is supported by substantial evidence.

First, both Pimentel and Urzua were members of the OVS gang.  Pimentel admitted that he was an OVS gang member in 2004 and 2007.  Cynthia, the mother of Pimentel's children, testified that Pimentel was an OVS gang member.  Urzua stated to police in 2009 and 2010 that he was an OVS gang member.  The People's expert witness on criminal street gangs opined that both Pimentel and Urzua were active OVS gang members.  Both Pimentel and Urzua had tattoos that, according to the gang expert, were signs and symbols used by the OVS gang:  Pimentel, for instance, had "Onterio" tattooed on his stomach, tattoos of the letter "W" on his right leg and "E" on his left leg (for "West End"), and the letters "OVS" tattooed in block letters on his head.  Urzua had "West End" tattooed on his wrist as well as an "I" on his right shoulder and an "E" on his left (for "Inland Empire").

Second, as gang members, Pimentel and Urzua would have had a motive in killing Sanchez as well as those accompanying him:  retribution for cooperating with the police.  A month prior to the murders, Urzua and another person attempted to rob Amigo's Market.  A detective investigating the attempted robbery learned that one of the suspects was possibly named Jesus and that someone else—who turned out to be Sanchez—might know more information.  The detective went to Sanchez's mobile home, showed Sanchez

a picture, and asked if the picture was Jesus. Sanchez said yes but then refused to answer additional questions. The detective testified that there were several other people standing outside of their mobile home parks at the time.

As the People's criminal street gang expert testified, "cooperating with the police" was the "ultimate low in the gang culture," and that retribution would have demonstrated that "you don't testify against South Side Onterio. You don't mess with South Side Onterio. And if you do, these are the repercussions." The fact that Sanchez had identified Urzua as part of an investigation would have given Urzua (as well as Pimentel) a motive for murdering all three victims, even if Pimentel was the direct perpetrator in Sanchez's and Tiburcio's death.

Third, Urzua's presence at the scene of the crime, his failure to take any steps to prevent the murders, and his companionship with Pimentel all provide further circumstantial evidence for the finding that Urzua aided and abetted in Sanchez's and Tiburcio's murders. (*People v. Garcia*, *supra*, 168 Cal.App.4th at p. 273 [factors to consider by trier of fact in determining aiding and abetting liability include "presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, [and] companionship"].)

Despite Urzua's argument to the contrary, substantial evidence placed Urzua at the scene. Not only was there a dying declaration from Contreras that "Jesus" had shot him as well as testimony from at least two eyewitnesses (as well as Pimentel) that Jesus was there), fingerprints recovered from drinking glasses outside Sanchez's trailer matched

Urzua's. Urzua's presence at the scene of the crime—which was not the result of happenstance—suggests that he and Pimentel shared a common purpose. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [defendant "did not independently happen by the scene of the crime," and defendants' "concerted action reasonably implies a common purpose"].) Additionally, nothing in the record—including anything set forth by Urzua in his defense—tends to support the conclusion that Urzua took steps to prevent Pimentel from shooting Sanchez and Tiburcio. Urzua has not attempted to argue otherwise.

As for companionship, Pimentel and Urzua were members of the same gang, and Urzua's sister (Cynthia) was the mother of Pimentel's children. Cynthia testified that Pimentel was "like an older brother" to Urzua. Pimentel's nickname was "Vamps," and he called Urzua "Little Vamps." At least one witness stated that some people thought Pimentel and Urzua were brothers. This may have included Contreras, who stated after being shot that it was "Jesus and his brother" who shot him. The close relationship between Pimentel and Urzua further supports the conclusion that the two shared a mutual motive.

All of this evidence could have rationally led a jury to find that Urzua aided and abetted Sanchez's and Tiburcio's murders. Accordingly, the evidence was sufficient for Urzua to be convicted of murder on counts 1 and 2.

*C. Penalty Phase Issues*

    *1. Sufficiency of the Evidence Regarding Gang Special Circumstance Findings*

        *and Gang Enhancement Findings (Pimentel and Urzua)*

Pimentel and Urzua contend that there was insufficient evidence to support either the gang special circumstance findings or the gang enhancement findings.[24]

To the extent that defendants' arguments are based on Urzua's challenge that there was insufficient evidence to show he was an aider and abettor—which we have rejected above—we reject those arguments here as well.

However, after briefing had concluded in this matter, the Legislature enacted Assembly Bill No. 333 (2021-2022 Reg. Session) (Assembly Bill 333). We ordered the parties to submit supplemental briefs addressing Assembly Bill 333. We now hold that (1) defendants' gang special circumstance findings and gang enhancement findings must be vacated, and the prosecution be allowed an opportunity to retry those allegations under the law as amended by Assembly Bill 333, and (2) section 1109, enacted by Assembly Bill 333, does not warrant reversal of the remainder of the judgment.

---

[24] To be precise, Urzua contended in his opening brief that there was insufficient evidence to support the gang special circumstance findings on counts 1 and 2 and the gang enhancements on all counts, incorporating his argument that there was insufficient evidence to show he was an aider and abettor. Pimentel joined in the argument in his reply brief and incorporated it by reference. As we discuss, because we base our holdings here on a law enacted after briefing on this case had completed, we construe the issue to apply to the gang special circumstance findings, the gang enhancement findings, and the personal firearm use enhancements on all three counts for both defendants, as applicable.

### a. *"Criminal Street Gang"*

A gang enhancement finding as well as a gang special circumstance finding rely on the definition of the term "criminal street gang." Section 186.22 enhances the punishment of a person convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1), (4).) Similarly, section 190.2, subdivision (a)(22) sets the punishment for first degree murder as death or life without the possibility of parole if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

Assembly Bill 333 narrowed the definition of "criminal street gang." What used to be defined as "an ongoing, *organized association or group* of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity" (former § 186.22, subd. (f), italics added) is now defined as "an ongoing, *organized association or group* of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity" (§ 186.22, subd. (f), italics added). Assembly Bill 333 also raised the bar for proving a "pattern of criminal gang activity," which is needed to establish a criminal street gang, in various ways: (1) predicate offenses now must be proven to have "commonly benefitted a criminal street gang, and the common benefit of the offense[s] is

more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must have been committed by two or more "members" of the gang, as opposed to any persons; (4) the currently charged offense no longer counts as a predicate offense; and (5) the list of qualifying predicate offenses is shortened. (Assem. Bill 333, § 3, revised § 186.22, subd. (e)(1)-(2).)

These changes to the law brought by Assembly Bill 333 apply retroactively to defendants; their judgments will not be final when the amendments take effect, and there is no disagreement among the parties whether this portion of Assembly Bill 333 is retroactive. (See *People v. Lopez* (2021) 73 Cal.App.5th 327, 344.)

Defendants may also be able to benefit from these changes. The parties stipulated at trial that OVS was a criminal street gang for purposes of section 186.22. However, the stipulation was that OVS was a "criminal street gang" as previously defined more broadly than in the revised, narrower definition that now applies to this case.

Accordingly, the proper remedy is to vacate the findings and remand to give the prosecution an opportunity to retry the gang special circumstance findings and the gang enhancement allegations under the new standards. (See *People v. Lopez*, *supra*, 73 Cal.App.5th at p. 348 [vacating enhancements in light of Assembly Bill 333 and remanding for limited retrial].)[25]

_____

[25] We note that this also means vacating (and allowing the prosecution an opportunity to retry) the firearm use enhancements in count 3 for Pimentel and counts 1

b.  *Section 1109*

Assembly Bill 333 also added section 1109 to the Penal Code.  As relevant here, under section 1109, in a case where a gang enhancement finding is alleged, the defense may demand a bifurcated trial such that "[t]he question of the defendant's guilt of the underlying offense shall be . . . determined" before any "further proceedings to the trier of fact on the question of the truth of the enhancement."  (§ 1109, subd. (a)(1)-(2).)

The parties dispute whether section 1109 is also retroactive.  Two cases have held that it is.  (*People v. Burgos* (2022) 77 Cal.App.5th 550 (*Burgos*); *People v. Ramos* (2022) 77 Cal.App.5th 1116 (*Ramos*); but see *Burgos*, *supra*, at p. 569 (dis. opn. of Elia,

---

and 2 for Urzua, as those enhancements were imposed pursuant to section 12022.53, subdivision (e)(1), which allows for a personal firearm use enhancement to apply to a "principal in the commission of an offense" only if a violation of section 186.22, subdivision (b) is "pled and proved."

Additionally, we note that imposition of the gang enhancements here meant that defendants would not be eligible for parole for 15 years (§ 186.22, subd. (b)(5)), which would have no direct effect on their sentence so long as there remained a sentence of life without the possibility of parole on any of their counts.  Similarly, vacating the gang special circumstance findings would not affect the sentences so long as the special circumstance finding of multiple murder (§ 190.2, subd. (a)(3)) applied, and the additionally imposed term of 25 years to life (to run consecutively to the life without parole terms) would also remain even if the personal firearm use enhancements noted above were vacated.  This could well render the issue unlikely to make any significant difference.  However, we nevertheless reach the issue because the People may wish at some later point to invoke the historical fact of the jury's true findings on these enhancements and special circumstance findings, making resolution of the adequacy of that finding appropriate on appeal.  (See *In re Varnell* (2003) 30 Cal.4th 1132, 1137-1138 [trial court's decision to strike prior conviction does not """"wipe out"""" the fact of the prior conviction or its effect in connection with future prosecutions].)  In any event, in contending that the findings were proper, the People did not contend that the issues were moot.

J.) [contending that section 1109 is not retroactive].)  We assume without deciding that section 1109 is retroactive.  (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)

Even if section 1109 is retroactive, however, defendants have not shown that reversal is required.  Unlike *Burgos*, which stated that the failure to bifurcate "likely constitutes 'structural error'" (*Burgos*, *supra*, 77 Cal.App.5th at p. 568), we do not view the failure as one defying harmless error analysis, as it remains possible to determine whether it is reasonably probable defendants would have obtained a more favorable result if their trials had been bifurcated pursuant to section 1109.  (See *Ramos*, *supra*, 77 Cal.App.5th at p. 1131 [citing *People v. Watson* (1956) 46 Cal.2d 818, 836], *People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480 [same].)  Here, defendants have not identified any evidence that would have been rightfully withheld until the gang enhancement phase of the trial.  Virtually all (if not all) of the gang-related evidence introduced at trial was relevant to establish issues such as identity and motive; the fact that the evidence also tended to show defendants' possible connections to gangs would not by itself have warranted exclusion during the first phase of trial.  "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see also *Ramos*, *supra*, 77 Cal.App.5th at p. 1132

["nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"].)

Accordingly, we find that section 1109 does not warrant reversal here.[26]

2. *Firearm Enhancement Striking (Pimentel and Urzua)*

Senate Bill No. 620 (Senate Bill 620), effective January 1, 2018, revised section 12022.53, subdivision (h) to give the trial court discretion in striking firearm use enhancements, which it did not have before. (See § 12022.53, subd. (h); Stats. 2017, ch. 682, § 2; former § 12022.53, subd. (h).) Pimentel and Urzua argue that remand is necessary because the trial court was unaware of its discretion under this section when it sentenced them.

Pimentel and Urzua were both sentenced on December 6, 2018. Section 12022.53, subdivision (h) took effect nearly an entire year before that date. Thus, Pimentel is flatly in error when he asserts that imposition of the firearm enhancements was mandatory at the time of sentencing. Urzua, who recognizes that sentencing occurred after Senate Bill 620 became effective, argues instead that there was no indication that the trial court was aware of its discretion under that section. All this would mean, however, is that the

---

[26] As a separate issue, the People challenge the constitutionality of Assembly Bill 333 to the extent that it narrowed the circumstances to which the gang special circumstance applies, as the special circumstance was added to the Penal Code by ballot initiative. We decline to reach the issue at this time. It is possible that the jury will find the special circumstance true even under the law as amended, and there is no reason to believe that the prosecution will need to introduce any evidence on the gang special circumstance it will not already have introduced on the gang enhancement allegations. Any additional burden placed on the prosecution in proving the gang special circumstance on retrial would be minimal. Should the issue remain at play following retrial, we will address its merits then.

66

record was silent on the issue, and "in light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 525, 527.) However, in light of our remand for a limited retrial under Assembly Bill 333, defendants may request that the trial court exercise its discretion under Senate Bill 620 at resentencing.

## D. *Cumulative Error (Urzua)*

Urzua contends that the cumulative effect of the alleged errors denied him a fundamentally fair trial. The only errors we have assumed for the sake of argument are the improper admission of the kites against Urzua and the improper admission of his un-*Mirandized* statement regarding when he last washed his hands prior to the GSR test.

With respect to each claim individually, we have concluded that any error would have been harmless under the applicable standard. We reach the same conclusion after reviewing them cumulatively. "'[N]one of the errors, individually or cumulatively, ""significantly influence[d] the fairness of [Urzua's] trial or detrimentally affect[ed] the jury's determination of the appropriate penalty."'"" (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 128.)

## III. DISPOSITION

The matter is remanded for the trial court to (1) vacate the gang enhancement allegations under section 186.22 on all counts for each defendant; (2) vacate the special

circumstance findings under section 190.2, subdivision (a)(22) on all counts for each defendant; (3) vacate the firearm use enhancements under section 12022.53 on count 3 for Pimentel and counts 1 and 2 for Urzua; (4) provide the prosecution an opportunity to retry the enhancements and special circumstance allegations under the law as amended by Assembly Bill 333; (5) if the prosecution elects not to retry the enhancements and allegations, or at the conclusion of retrial, resentence defendants either by reinstating their previous sentences or by imposing new sentence without the enhancements or allegations, as appropriate; and (6) if defendants request it, exercise its discretion under section 12022.53, subdivision (h).  In all other respects the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

We concur:

FIELDS _____
Acting P. J.

MENETREZ _____
J.

68